UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**CARLEE RYAN PIATT**                                                    **PLAINTIFF**

**VS.**                              **CIVIL ACTION NO: 3:18-cv-00275-MPM-RP**

**DOLGENCORP, LLC**                                          **DEFENDANT**

## ORDER

This cause comes before the court on the motion of defendant Dolgencorp, LLC d/b/a Dollar General, for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Carlee Ryan Platt has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a Title VII sexual harassment case which presents one of the most dramatic differences between the factual account of the plaintiff and that of the defendant, of any case which this court has encountered. In her brief, plaintiff Piatt provides an account of severe sexual harassment which she allegedly suffered at the hands of her former Dollar General Supervisor Dakota Byrd which, if believed by a jury in full, likely constitutes a "slam dunk" Title VII hostile work environment claim. Indeed, plaintiff's account of sexual harassment includes allegations of an actual rape by Byrd, alleges corporate indifference by Dollar General when it learned of Byrd's actions, and generally "checks all the boxes" of a Title VII hostile work environment claim. For its part, however, defendant Dollar General responds with a very powerful brief which makes a forceful case that plaintiff's sexual harassment claims appear to be so powerful precisely because she is fabricating them out of whole cloth, in an attempt to secure a large recovery in this lawsuit.

This court notes that there is one limited extent to which the parties' factual accounts of this case converge, namely in that they each acknowledge that there was a sexual relationship between plaintiff and Byrd during the time she worked at Dollar General. From reading the parties' briefing, it seems clear that the primary factual dispute between them involves the question of whether Byrd's advances were "welcome" to plaintiff or not. This is a crucial question in this case, since the Fifth Circuit has made clear that Title VII only prohibits "requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee." *Marquez v. Voicestream Wireless Corp.*, 115 F. App'x 699, 701 (5th Cir. 2004)(quoting *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989)).

While this court thus emphasizes that defendant only faces potential legal liability for sexual advances by Byrd which were "unwelcome" to plaintiff, it must state for the record that, even under defendant's version of the facts, Byrd engaged in conduct which must be regarded as highly ill-advised and inappropriate. Indeed, it seems clear that Dollar General could have avoided any threat of legal liability in this case if it had, through its hiring or training practices, managed to avoid employing a store manager who deemed it appropriate to start a sexual relationship with an employee under his supervision. It is, with good reason, widely accepted in today's society that this is a practice which is, under the best of circumstances, exceedingly unwise and which almost inevitably leads to negative consequences. It is nevertheless undisputed that Dollar General hired a manager who engaged in such conduct, and it therefore seems clear that, even under its version of the facts, defendant is far from "squeaky clean" in this matter.

2

That brings this court to the crucial fact, which is ultimately dispositive of the present motion, that it must "view the [summary judgment] facts in the light most favorable to the plaintiff," as the non-moving party. *Wilkerson v. Goodwin*, 774 F.3d 845, 851 (5th Cir. 2014). Stated differently, this court is not serving as a neutral arbiter of the facts at this stage of the proceedings. To the contrary, this court has the legal obligation, at this juncture, to place its thumb on the scale in favor of the plaintiff in its consideration of the factual issues in this case. In light of this obligation, this court is simply not in a position to do what defendant would have it do, namely reject out of hand plaintiff's lengthy sworn deposition testimony in which she provides a detailed account of severe sexual harassment which she claims to have suffered at the hands of Byrd.

This court further notes that, since it is an established fact that Byrd is the sort of manager who is willing to engage in a sexual affair with an employee under his supervision, it is not a great factual leap for jurors to conclude that he is also the sort of manager who is so driven by his sexual urges that he would continue to pursue an employee even after she had expressed some degree of initial resistance to his advances. In so stating, this court observes that not all consensual sex acts involve an instant agreement by the target of the seduction to engage in sex. Rather, there is often an element of pursuit and persuasion involved and the overcoming of initial resistance. This court submits that while the overcoming of any such initial resistance will likely suffice to remove the possibility of criminal liability, it is very much an open question whether it would suffice to render the encounter "welcome" as a matter of law within the meaning of Title VII. Indeed, this court believes that, in the context of an already highly inappropriate attempted seduction of an employee by a manager, any initial resistance by the employee *should* suffice to render the advance "unwelcome" within the meaning of Title VII, or at the very least to create

3

triable jury issues in this regard. In this vein, this court notes that, judging by the parties' briefing, neither the Fifth Circuit nor the U.S. Supreme Court appear to have provided clear guidelines on what is or is not an "unwelcome" sexual advance in this context, which makes this court even more inclined to submit these issues to a jury.

This court further observes that it is entirely possible for two things to be true at once. That is, it is entirely possible for Byrd to have made an "unwelcome" sexual advance upon plaintiff, and yet for her to have ultimately given in to his advances and engaged in a relationship with him which, at some point, became consensual. It is further possible for plaintiff to have an entirely valid Title VII claim in this case and yet for her to have lied in her deposition by providing an exaggerated depiction of Byrd's actions in order to increase her potential financial recovery. In this court's experience, the truth in matters such as these often involves "shades of grey," and it frankly appears from the record that neither of the principals of the sexual affair in this case are saintly individuals. Naturally, jurors will be under no obligation to accept either side's version of the events in full, but it seems clear from the record that they will be the ones to make the ultimate factual findings in this case. Having previewed its ultimate summary judgment ruling in this case, this court now discusses the factual allegations set forth in plaintiff's brief.

In providing her version of events, plaintiff begins by implying that it was Byrd's intent to pursue her even before she began working at Dollar General. Indeed, plaintiff alleges that Byrd suggested that she apply for a position with the store after seeing her Facebook page. Specifically, plaintiff alleges that:

> Carlee Ryan Piatt (hereinafter "Piatt") was a naïve and financially desperate 24 year-old single mother recently divorced when she landed a job at Dollar General in Oxford, MS. She was employed from 01/28/2018 to 04/05/2018 (about 9 weeks) with Dollar General, also known as Dolgencorp, LLC.

4

> Piatt was on vacation when she received a Facebook messaging from Dollar General Supervisor Dakota Byrd (hereinafter "Byrd") in mid-January 2018. Byrd expressed his desire to hire Piatt despite Piatt never having filled out an application for that job.
> Piatt had applied months ago to another Dollar General store under a different supervisor but did not get the job. Piatt learned Byrd got her name from another female employee. Byrd took the name and looked Piatt up on Facebook and reached out to Piatt on Facebook initially to offer her a position.
> Piatt informed Byrd that she was away on vacation, and Byrd offered to fill out her application and get her passed a drug test if that was going to be a problem. (Upon filing the Complaint, Byrd misrepresented to Dollar General that he did not fill out Piatt's application, however the truth was quickly uncovered as Byrd had incorrectly signed Piatt's initials to certain forms.)
> When Piatt returned to Oxford, Byrd had Piatt come by his store and informed her that he desired to train her, and that he was going to promote her to Assistant Manager very soon.

[Brief at 1-2].

In her brief, plaintiff asserts that, after hiring her, Byrd wasted little time in beginning his harassing behavior:

> Upon Byrd's hiring of Piatt, he immediately made comments about Piatt's body. Byrd informed Piatt that he desired her to wear tight leggings while other female employees wore long loose pants. Byrd on several occasions informed Piatt that he desired for her to wear her hair down and not in a clip like other female employees. Byrd made a comment about a "Nike" shirt that Piatt wore to work one day, stating he never saw the "Nike" emblem, only the breasts.
> Byrd would demand that Piatt accompany him on drives to other stores. On these drives and on multiple occasions, Byrd would reach over and grab Piatt's hand or leg.
> Within a few days of being hired, Byrd showed up at Piatt's residence unannounced, uninvited, and unwelcomed on the pretense of discussing work. Piatt walked on the porch to speak with her new supervisor, and he walked past her into her home and wanted to talk on Piatt's couch.
> Byrd did not discuss work, but gave a sad story about his family, and then he expressed his "like" of Piatt. Piatt was very uncomfortable with Byrd's actions, and that evening she requested a transfer to another store and informed Byrd that she did not want to have that conversation.
> Byrd denied her request to transfer. Upon leaving Byrd grabbed Piatt and gave her a hug, leaving Piatt extremely uncomfortable. Piatt did not want to alienate or offend her new supervisor, and she certainly did not want to lose her job, and she did not want Byrd returning to her home. The next day at work and for the remaining weeks at work, Byrd would make many inappropriate comments, touches, and hugs that were confirmed by co-workers. Piatt became afraid of Byrd and described him as very strong, controlling, and forceful. Piatt knew Byrd would fire her if she did not follow his instructions.

[Brief at 3-4].

Plaintiff alleges that, several weeks after her hiring, Byrd's harassment of her escalated into an actual rape in her home:

> In late February, Byrd showed up unannounced, uninvited, and unwelcomed at Piatt's home. He forced his way into Piatt's home and forced Piatt to have sex. Piatt stated in her deposition that Byrd raped her. However, the following days at work, Byrd acted as if nothing had happened. Piatt Dep. pp. 186-187: **Dollar General counsel**: *"You're not accusing Mr. Byrd of raping you, are you?"* **Piatt**: *"Our first encounter?"* **Dollar General counsel**: *"So are you, or have you ever accused Mr. Byrd of rape? Just start with yes or no."* **Piatt**: *"Yes."*

[Brief at 4].

In explaining her failure to immediately quit or complain of Byrd's actions, plaintiff writes that:

> Piatt did not know who to turn to inside or outside of work. She had been deprived of the Dollar General handbook and the sexual harassment training by Byrd as he filled out her application and conducted the training modules, especially the sexual harassment one, for her. Piatt believed if she said anything, no one at Dollar General would believe her, and she absolutely would lose her job. Piatt Dep. pp 364-365: **Dollar General counsel**: *"He never….Dakota Byrd never threatened you physically, did he?"* **Piatt**: *"He told me no one would believe me, that the…"* **Dollar General counsel**: "When?" **Piatt**: *"When I was wanting a transfer one time. I was like, you know, I want a transfer. I want to leave. And was like, well, you know, if you're going to plan on telling on me, no one will believe you. And then he talked about how Candice loved him and he had been there for five years and everybody liked him and loved him."*
> Piatt looked for other employment but needed Byrd to be a good reference in order to receive another job. Piatt decided she was trapped, and it would be best to pretend and comply with Byrd's demands rather than be fired.

[Brief at 4-5].

As discussed below, defendant (understandably) places great emphasis in its briefing on numerous text messages sent by plaintiff to Byrd which, among other things, praised his sexual prowess and expressed romantic and sexual feelings toward him. In providing her explanation for these messages, plaintiff writes that:

> Byrd sent gifts to Piatt and made promises of special treatment and promotions to her.

6

> However, Byrd continued to expect sex from Piatt while she was employed with him. Piatt gave into Byrd's actions and sexual demands. Byrd provided sexy lingerie, told her to wear it, and that he desired for her to "talk dirty" to him on the telephone/texts.

[Brief at ]

Plaintiff did eventually leave Dollar General, and, in describing how she believes she was constructively discharged from her position, she writes that:

> Ms. Piatt continued to request transfers to other stores, and Ms. Piatt even contacted other store supervisors to inquire of openings. However, Mr. Byrd denied any transfer and wanted Ms. Piatt under his supervision. Ms. Piatt felt trapped, was not allowed to transfer, and had no option but to leave or continue under the control of Byrd's demands. She was therefore constructively discharged from Dollar General.

[Brief at 5].

This court notes that, soon after plaintiff left Dollar General, she learned that Byrd was still living with his ex-girlfriend Aubree Riggle. Around that same time period, she also learned that she was pregnant with a baby which she eventually miscarried. In her brief, plaintiff describes these events as follows:

> Upon leaving, Piatt was able to get a reference by Byrd for a new job. Coincidentally, Piatt learned Byrd's ex-girlfriend, Aubree Riggle, worked a few doors down at another store. Piatt decided to speak with her about Byrd only to learn that Byrd was still living with Riggle, and learned Byrd had promised to marry Riggle as well. Riggle defended Byrd, but left Byrd. Piatt attempted to explain to Riggle what really happened, but Riggle would not talk with Piatt. Piatt attempted to contact Byrd with the information she learned, but he avoided Piatt. Piatt called and sent texts.
> A day or two later and after not feeling well, Piatt decided to go to the doctor. Piatt discovered she was pregnant by Dakota Byrd. Piatt attempted to contact Byrd about their baby, and he would not take her calls or respond to any texts. Byrd filed a restraining order with the Oxford, MS police department, and he had Ms. Piatt served…the charges were eventually dropped. (See Exhibit A). Subsequently, Piatt miscarried the child and suffered extensive medical complications following, and Piatt continues to suffer.

[Brief at 5-6].

In reading plaintiff's own description of these events, it is difficult for this court to avoid the impression that, at some point in her relationship with Byrd, she developed strong emotional

feelings towards him, including feelings of jealousy when she learned of his continuing relationship with Riggle. In so stating, this court would hasten to add that the development of such romantic feelings on plaintiff's part, even accepted as true, should not necessarily be regarded as the death knell of her sexual harassment claims in this case. In the court's view, it is entirely possible for a manager to abuse his position of authority over an employee in order to seduce her in an "unwelcome" manner, and thereupon have that seduction lead to genuine romantic feelings on the part of the employee. Human beings are complex and emotional creatures, and this court can discern no reason why the development of such feelings should in any way negate the unlawfulness of an initially unwelcome seduction.

At the same time, it is not clear to this court that it will be at all to plaintiff's advantage to deny at trial what seems to virtually scream from the record in this case, namely that at some point in her relationship with Byrd, she did, in fact, develop emotional feelings for him and that this is not simply a clear-cut case of an employee who "wished to be left alone." In so stating, this court will begin its discussion of defendant's very different description of the facts of this case.

> In its brief, defendant introduces its version of the facts of this case as follows:
>
> Plaintiff Carlee "Hannah" Piatt worked for Dolgencorp, LLC ("Dollar General") for just over two months, from January 28, 2018 until April 5, 2018. Within days of starting, she and her supervisor, Dakota Byrd, began a sexual relationship that continued off and on for approximately five months, including after Piatt left Dollar General. Piatt and Byrd were both 24 years old at the time. ( She was in the middle of a divorce and had a young daughter. He was unmarried but living with a long-time girlfriend, Aubree Riggle, of whom Piatt was aware. Neither Piatt's ongoing divorce nor Byrd's ongoing relationship with Riggle kept them from seeing each other. They got together frequently for sex at Piatt's home, and nearly as frequently in Byrd's vehicle. When they weren't together, they stayed in touch through hundreds of intimate and often graphic text messages they sent to each other. The text messages included the following:

− In a text chain dated February 6, 2018, Piatt tells Byrd "Meet me at my house." Later, at 6:05pm Byrd responds "delete your messages to be safe please . . . ," to which she replies "I still smell you on me."
− On February 13, Byrd asks her to tell him three things she wants "within 100-150 bucks or lower lol." She responds "Absolutely not! Lol. Flowers is plenty . . . And not any that are expensive! Lol. Any that you pick out I'll love . . . Goodnight."
− On February 14, they exchange "Happy Valentine's Day" messages.
− On February 18, Piatt sends Byrd a photograph of a Victoria's Secret bag to Byrd, as well as photos of candy and flowers that he had sent her.
− On February 20, she sends a photograph of a bra to him, to which he responds "are you wearing that now." She responds immediately "wouldn't you love to find out."
− On February 21, she tells him "I'm back in bed. I get to sleep in until 5:40." She then asks him "What are you doing?"
− On February 27 and March 8, they exchange messages encouraging the other to delete their text messages, and Piatt adds that "I put a passcode back on my phone, too."
− On March 13, they exchange messages in which Byrd offers to check with another local store manager ("Christian") to see about transferring Piatt to her store. Piatt responds: "I want to stay. Even though half the people don't like me, I like my job. I like being under you."
Many of the text messages that Piatt produced in discovery are undated screen shots, but those messages are just as revealing of the consensual relationship she enjoyed with Byrd. They include:
− Piatt: "I miss you." Byrd: "I miss you too lol." Piatt: "The tension is building up again."
− Piatt: "You felt so good inside me." Byrd: "I hope I did lol." Piatt: "You have no idea."
- Byrd: "I can make you squirt now that I saw what you did." Piatt: "You're a fast learner." Byrd: "Yes I am. I want you to sit on my face." Piatt: "Yes sir."
− Piatt: "You aren't afraid we'll be seen?" Byrd: ". . . I know spot to go." Piatt: "Let me put on my sexy bra." Byrd: "You don't have to wear one. Bring towel. Or I can buy one." Piatt: "I'll bring one. Make that two."
− Piatt: "What time do I need to be at [the] Sardis [store]? Or do you want me to meet you at our store and ride together?" Byrd responds that they had better not ride together or it would look suspicious, to which she responds "Yea you're right lol."
− Piatt: "What's your Hulu info again?" Byrd responds with his username and password and she sends him a photo showing a heart shaped box of candy.
− Piatt: "I don't want to ask this but I need to know. Have you had sex with her since you and I started sleeping together." After Byrd denies having done so, Piatt continues: "I've never done this before. Been with someone who's with someone else. It's hard is all…"
− Piatt: "I'll stay until you can replace me. You were honest, I know. But we would never work even if she was out of the picture. You're comfortable cheating on her and sleep next to her in the bed every night. I'd never be able to trust that you weren't cheating on me. I'm sorry. It's best this way."
− Piatt: "It's not any of their business if I was to be pregnant or not. It wouldn't affect my divorce or custody or anything. I just wouldn't want them or my ex to know so soon because it's our business and not anyone else's."

9

[Defendant's brief at 1-3].

In its brief, defendant notes that, after plaintiff left Dollar General, she sent additional text messages which admitted that she had been in a romantic relationship with Byrd:

> By June 22, the issue of Byrd still having another girlfriend reemerged and Piatt broke things off again. The text message she sent Byrd that day reflected her sentiments: "I want to end things with you for good. For real this time. No more hooking up, no more friendship, anything. . . . You lied from the beginning and never had any intentions of ending things with her. . . Two days later, Piatt went one step further when she outed Byrd to Riggle, sending her the following message: "Dakota and I have been seeing each other for 6 months. I ended it with him for good a few days ago. . . I'm truly sorry. . . " Piatt's message prompted a quick reply, and a series of heated messages between the two women on June 24 and 25, 2018. To Riggle, Piatt acted contrite for having been part of the love triangle, stating "I'm so sorry. He said you were cheating and had a boyfriend and it was over. . . . And he wanted to be with me." (Text p. 87).

[Defendant's brief at 4].

This court regards defendant's proof and arguments quoted above as very strong impeachment evidence in this case, and, after considering plaintiff's text messages, the record evidence seems virtually overwhelming that she did, in fact, develop a consensual emotional relationship with Byrd at some point. This court frankly does not believe that it would be to plaintiff's advantage to attempt to dispute this fact before a jury at trial. Regardless, this court must disagree with defendant's argument that this fact, even if accepted as true, makes all of its potential Title VII liability in this case magically disappear. This court has already discussed many of the factors which lead it to this conclusion, and it will not fully repeat them here. On a very basic level, however, this court reiterates that plaintiff swore under oath that she was outright *raped* during her first sexual encounter with Byrd. This court must consider the facts in the light most favorable to plaintiff, and, that being the case, it cannot and will not simply declare that there is no truth whatsoever to her version of events and that Byrd's first sexual advances were entirely "welcome" on her part. This court would hasten to add that it would not be at all

10

surprised if jurors conclude at trial that Byrd's initial advances were, in fact, welcome to plaintiff, but it is simply not in a position to declare this to be a fact on summary judgment. Needless to say, this court has no idea what happened during Byrd and plaintiff's first sexual encounters, and it will be left to jurors to make their own best determination in this regard based upon the available evidence.

This court believes that, regardless of what plaintiff and Byrd's relationship (as evidenced by text messages) developed into being, this would not negate the initial unlawfulness of any decision by Byrd to persist in sexual advances towards plaintiff after she had made clear that those advances were unwelcome. Simply stated, this court does not believe that Title VII was enacted to reward unusually persistent and seductive sexual harassers who eventually succeed, after initial resistance, in fully seducing an employee under their supervision. This court further believes that if a supervisor such as Byrd wishes to avoid any possibility that he will have to explain his actions to a jury, then he should seek out his sexual conquests from someone other than employees under his authority.

This court submits that, even if it seems unlikely that plaintiff suffered a classic violent rape at Byrd's hands during their initial sexual encounter, this still leaves open many possible factual scenarios in which Byrd made initial sexual advances which could be regarded by jurors as "unwelcome" under Title VII. Once again, it has already been established that Byrd is the sort of manager who carries on highly inappropriate sexual affairs with employees under his supervision, and this court frankly does not believe that there is a great factual distance between such inappropriate conduct and sexual advances which are sufficiently persistent and obtrusive as to be regarded as "unwelcome" under Title VII. Moreover, this court reiterates its view that the unlawful nature of any such initial "unwelcome" advance, and defendant's liability for it,

11

would not magically disappear if jurors conclude that, at some point, plaintiff became a fully voluntary participant in a sexual relationship with him.

As a final point, this court submits that there is a certain inherent degree of plausibility to claims that a manager who chose to make sexual advances towards an employee under his supervision would have been willing to make such advances even if they were "unwelcome." In so stating, this court observes that, by choosing to make such advances towards a subordinate, a manager is demonstrating himself not content to seek out romantic partners from individuals "out in society" with whom he shares a level playing field. That being the case, it strikes this court as entirely fair to wonder why a manager would specifically seek out a romantic relationship in which he occupied a position of power if he was not prepared to use that power to overcome any initial resistance to his advances? This court also observes that plaintiff's text messages in this case were sent to an individual who, she was well aware, was in a position to influence her work conditions and to provide negative job references. While this court does not believe that this fact fully explains plaintiff's text messages in this case, it does appear to be an entirely legitimate point of argument for her at trial.

In light of the foregoing, this court concludes, with full recognition of the power of defendant's impeachment evidence in this case, that genuine fact issues exist regarding whether Byrd made "unwelcome" sexual advances towards plaintiff, in such a manner as to give rise to potential liability under Title VII. Having determined that there are triable fact issues regarding defendant's liability for Byrd's alleged sexual harassment in this case, this court will follow its general practice and wait until after the presentation of the evidence at trial to determine exactly what issues (including whether plaintiff was constructively discharged) should be submitted to a jury for a ruling. Having said that, this court has no doubt that this case presents at least *some*

issues which will require consideration by a jury, and, in such cases, its general approach is to wait until it has all the evidence before it to make a final decision on what specific claims should be submitted to a jury.

With this caveat, this court is presently inclined to allow plaintiff to submit her claims for hostile work environment and constructive discharge to the jury, but it is presently disinclined to allow her to submit any claim for retaliation. In expressing this inclination, this court is motivated both by the scarcity of plaintiff's proof presented on the retaliation issue and also by her failure to exhaust her administrative remedies on that charge before the EEOC. In so stating, this court emphasizes that plaintiff submitted a rather bare-bones complaint before the EEOC in which she merely alleged that "[s]ince my employment began, I was subjected to sexual harassment by Dakota Byrd, Supervisor. In addition, Mr. Byrd denied my request to be transferred to another location." [EEOC Charge of Discrimination at 1]. While this court acknowledges that precedent allows courts to consider facts that could have reasonably been developed during the EEOC investigation, it believes that there is a limit to how much weight a single-sentence EEOC charge containing no mention of retaliation can bear.

This court is also tentatively inclined to agree with defendant's arguments that plaintiff should be held to the representation in her EEOC charge that the last date of the discrimination she suffered was on April 5, 2018. [EEOC charge at 1]. In so stating, this court emphasizes that plaintiff failed to select the "continuing violation" box on the EEOC charge which would have allowed her to pursue a claim for ongoing discrimination.[1] [*Id.*] Exhaustion of remedies issues

---

[1] This court notes that any such ruling should arguably not apply to an attempt by plaintiff to recover damages for her miscarriage, since that would seemingly involve damages arising from conduct which occurred before April 5, 2018. This court will making a final ruling on this issue at trial.

aside, this court believes that plaintiff's proof in this case becomes weaker and weaker the further into the relationship with Byrd one looks, and it frankly believes that she would be hard-pressed to allege that she was suffering ongoing sexual harassment after the date she indicated on her own EEOC complaint. To the contrary, defendant has very powerful arguments that, as of the April 5, 2018 date selected by plaintiff, she was engaged in a fully consensual relationship with Byrd, regardless of the circumstances under which that relationship may have begun. This court accordingly does not believe that this is a case where the interests of justice cry out for plaintiff to be allowed to go beyond the limitations which she herself set for her claims in her EEOC charge. This is, however, merely this court's inclination at this juncture, and it will, once again, make a final ruling on this issue after the presentation of the evidence at trial.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is denied.

So ordered, this the 5th day of September, 2023

/s/ Michael P. Mills
U.S. DISTRICT COURT